# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**YOLANDA PEREZ,**

    **Plaintiff,**

**v.**                                                        **Case No.  8:12-cv-546-T-30TGW**

**CELLCO PARTNERSHIP d/b/a**
**VERIZON WIRELESS SERVICES,**
**LLC,**

    **Defendant.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Cellco Partnership d/b/a Verizon Wireless' Motion for Summary Judgment (Dkt. 39) and Plaintiff Yolanda Perez's Response in Opposition (Dkt. 48).  The Court, having considered the motion, response, record evidence, and being otherwise advised in the premises, concludes that the motion should be granted.

## PERTINENT FACTS[1]

Plaintiff Yolanda Perez filed the instant action against Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") alleging interference with, and retaliation for, Perez's exercise of her Family Medical Leave Act ("FMLA") rights.

---

[1] These facts are taken in a light most favorable to Perez, the non-movant.

Verizon, the nation's largest wireless service provider, is headquartered in Basking Ridge, New Jersey, and does business across the country, including operating a Customer Care Center in Tampa, Florida that contains call centers for Verizon's customer and financial services functions. Verizon maintains a written FMLA policy, provided to all employees and accessible at any time on Verizon's intranet, informing eligible employees of their right to take up to twelve weeks of job-protected leave in any twelve-month period for an FMLA-qualifying reason, including the employee's own serious health condition and to care for a family member suffering from a serious health condition. Verizon contracts with MetLife, an outside provider, to manage its employees' FMLA claims.

In operation, a Verizon employee wishing to use FMLA leave submits a leave request and healthcare provider certification forms directly to MetLife, which then sends the employee a confirmation and notice. MetLife, not Verizon, makes the decision to approve or disapprove leave, based on data from the healthcare provider. Upon approval, MetLife informs Verizon's Resource Management Group ("RMG") that the employee is authorized to take leave under the FMLA for a designated period.

With respect to FMLA intermittent leave, i.e., FMLA leave in which the employee uses leave in increments and for a single qualifying reason, following MetLife's approval, the employee calls RMG, as needed, to report an FMLA absence. RMG then provides a report to the employee's direct supervisor that states that the employee is taking FMLA leave, and whether the leave is paid or unpaid.

Perez began working for a predecessor company of Verizon on July 14, 1997, in what would become Verizon's Customer Care Center, where she handled calls from customers as a Customer Service Representative. Perez began using intermittent leave under the FMLA in 2003, for her identified serious health condition of diabetes. Perez continued using FMLA leave on an intermittent basis for seven of the next nine years of her employment with Verizon, both for her own serious health condition and to care for her mother, who suffers from Alzheimer's disease.

In August 2007, Verizon promoted Perez to the position of Coordinator-Customer Care. Subsequently, Verizon transferred Perez, at her request, to its Financial Services Call Center. On January 11, 2009, Perez began working as a Senior Representative-Financial Services. During the relevant time, Leiby Ponce supervised Perez. Ponce reported to Associate Director David Stanford.

The record is undisputed that Perez encountered performance problems after her transfer to Verizon's Financial Services Call Center. The Senior Representative-Financial Services position is responsible for collecting balances on delinquent accounts. Perez conceded that she experienced difficulty with her average handle time because she was in the habit of giving customer service assistance, rather than transferring those types of issues to her former department.

Verizon utilizes neutral, objective performance metrics to evaluate the performance of the Senior Representatives in Financial Services. Specifically, Verizon utilizes six

performance metrics, weighted by Verizon for relative importance, that form part of a comprehensive monthly scorecard generated for each representative. The scorecard shows the representative's results for each individual metric. It is undisputed that the measurements reflect a representative's productivity *during the hours when he or she is actually working*.

The Senior Representatives in Financial Services are subject to a performance management program. A failure by a representative to earn a scorecard which is "performing" or better results in the progressive discipline set forth in the program, as follows:

- Developmental performance discussion ("DPD")
- Action plan
- Verbal warning
- Performance improvement plan ("PIP")/Written warning
- Final performance improvement plan/Final written warning ("FWW")
- Employee reviewed for separation

(Perez deposition at 48-49 & Ex. 7 thereto; Ponce deposition at Ex. 1).

A representative may move up and down the steps of the performance management program based on performance achieved. For example, a representative demonstrating sustained performance, in the form of three consecutive performing or better scorecards, will move back a step. Participation in the program includes regular meetings with management to review performance, coach the representative, and reinforce expectations. Any representative achieving six consecutive performing or better scorecards will be removed completely from the program. A representative's participation in the program is distinct from

conduct-related discipline, including discipline for poor attendance, which is assessed on a different track.

On March 9, 2010, Verizon issued Perez a DPD, corresponding to the first step of the program, after Perez had not achieved a passing scorecard for February 2010.  During her deposition, Perez testified that she did not independently keep track of her productivity statistics and has not challenged the accuracy of any of her metrics.  (Perez deposition at 169).  Perez failed her April 2010 scorecard and was placed on an Action Plan, the second step of the program.  Verizon issued Perez a Verbal Warning on June 29, 2010, after Perez failed her May 2010 scorecard, the third step of the program.  On September 21, 2010, Perez was placed on a PIP for failing her August 2010 scorecard, the fourth step of the program.

Beginning in September 2010, Perez's performance improved; she achieved four straight months of passing scorecards.  This improvement permitted her to go back one step in the performance management process, i.e., to the Verbal Warning step.  Perez's 2010 annual review rated her as "Developing" and noted that Perez struggled with her inbound average handle time and "was not able to meet the goals".  (Perez deposition at Ex. 29).

Perez failed her scorecard for January 2011, but Verizon did not count it because it was training Perez on a new task involving customer credit operations.  The scorecards for all Financial Services Senior Representatives for February 2011 were excused due to Verizon's introduction of the Apple iPhone as a platform for its voice and data products.  In March 2011, Perez failed her scorecard.  Perez was placed on a PIP, the next step of the

program, and was warned that another failure could progress her to a FWW.[2] The PIP, dated April 28, 2011, included coaching recommendations that once again focused on behaviors impacting Perez's average handle time. During her deposition, Perez stated that she did not dispute the accuracy of the PIP. She also acknowledged that if she did not meet this PIP, she could move to the final written warning stage.

After the April 2011 PIP, Perez achieved four straight months of acceptable scorecards, which again moved her back one step (to Verbal Warning) in the performance management program. Specifically, Perez received an average score of "Achieved" for April 2011, May 2011, June 2011, and July 2011. (Perez deposition at Ex. 37).

In July 2011, Ponce and Perez discussed a scheduling arrangement that would allow Perez time during the work day to attend to her mother's periodic needs. Ponce suggested that Perez receive an additional thirty minutes for lunch; Perez would then make up the time at the end of her shift. Perez ultimately agreed with Ponce and e-mailed Ponce on July 21, 2011, requesting that, each day, she be allowed "up to" thirty extra minutes at lunch for this care-giving purpose. (Perez deposition at 100; *id.* at Ex. 33).

According to Perez's deposition testimony, a few months later, Perez and Ponce met with Stanford to discuss their arrangement regarding the additional thirty minutes during

---

[2] As previously explained, Perez did not proceed to FWW at this point because she had four previous months of successful performance. Thus, Perez essentially continued at the same level of the process, PIP.

lunch, and Perez provided Stanford with documentation of her mother's condition. Stanford took the documentation and told Perez that he would "get back to her".

After not hearing anything from Stanford for a while, Perez inquired about the status of her request with Ponce and Ponce told Perez that Stanford said that Perez should "go ahead and open an FMLA for [her] mother". (Perez deposition at 24-25). Perez did not understand at the time why she would have to seek FML time for her mother. It is undisputed in the record that, under Verizon's policy, in order to receive a work-place accommodation for an issue unrelated to the employee's own medical condition (like for the care of family members), the employee must apply for the time through the FMLA. Perez testified during her deposition that this was the only time she talked to Stanford about FMLA time.

Perez acknowledged during her deposition that nobody at Verizon told her that seeking leave under the FMLA would adversely affect her ability to perform. She also acknowledged that Stanford was the one who suggested that she take FMLA time for her mother. Specifically, Perez testified as follows:

> Q   Okay. Do you recall - - earlier today you told me that Mr. Stanford was the one that told you you should put in for FML for your mom. Is that correct? Do you remember telling me?
> A   That's what Leiby Ponce had told me that he said.
> Q   Okay. And you had no direct discussions with him about that other than in the one meeting you had with him?
> A   Not direct discussions. He was just provided with the Hospice form, all the health issues forms.
> Q   *He never expressed disappointment or some sort of upset about you applying for FML for your mom in your presence?*

>        A        *No.  Because I had no contact with him.*

(Perez's deposition at 132:6-20) (emphasis added); *see also* (Perez's deposition at 179:3-13).[3]

Perez failed her August 2011 scorecard, which resulted in Perez continuing on to the fourth step of the performance management program, PIP.[4]  Perez passed her September 2011 scorecard and, also during that month, she followed through on Stanford's suggestion that she seek leave under the FMLA to care for her mother, applying for intermittent leave on September 21, 2011, through MetLife.  MetLife opened an FMLA claim and approved Perez's request to take leave on an intermittent, care-giving basis from September 21, 2011 through November 2, 2011.

Perez failed her October 2011 scorecard, which moved Perez to the fifth step of the performance management program, FWW.  As a result, on November 3, 2011, Ponce met with Perez to discuss Perez's October 2011 performance and told Perez that if she failed another scorecard, her "performance in its entirety would be reviewed", i.e., the final step under Verizon's performance management program.  (Perez deposition at Ex. 35).  Perez

---

[3] Portions of Perez's Affidavit (Dkt. 48-1), relied upon in her response to Verizon's summary judgment motion, completely contradict Perez's deposition testimony and will not be considered by this Court.  Specifically, paragraph 11 of the Affidavit is directly contradictory to Perez's deposition testimony, cited herein, to the extent that Perez states that Stanford "appeared hostile to the idea" of Perez taking FML for her mother and "clearly indicated that he did not approve of this option any more than he had approved of agreeing to a reasonable accommodation."  As such, these statements of the Affidavit constitute a sham and are hereby stricken. *See Van T. Junkins and Associates v. U.S. Industries,* 736 F.2d 656 (11th Cir. 1984).

[4] As a result of Perez's successful performance in April, May, June, and July of 2011, Perez did not progress to FWW when she failed her August 2011 scorecard.

testified that, at this point, she understood that she could progress to the next step of final written warning.[5] Ponce offered various tips and pointers to help Perez succeed. She also offered to set up additional training opportunities. Around this same time, Ponce met with Stanford to discuss Perez's performance, specifically, Perez's progression to FWW.

The FWW was provided to Perez on December 6, 2011. It was approved by Stanford and Human Resources. The FWW specifically warned: "The employee is subject to termination at the end of the performance plan period if satisfactory progress is not achieved". (Perez deposition at Ex. 37). It also provided for a review in thirty days. Specifically, the FWW stated that Ponce and Perez would meet again in thirty days to review and assess Perez's performance. Ponce coached Perez the same day that Perez was issued the FWW. She repeated that Perez needed to improve her inbound calls per hour. Ponce arranged for role-playing practice on different customer call scenarios and reviewed with Perez an internal assessment tool used by Senior Representatives to make timely decisions.

On December 28, 2011, Ponce wrote to Perez, warning Perez that her December month-to-date scorecard was below acceptable and suggesting ways to improve her Average Dialer Update Time. Perez failed the December 2011 scorecard. This outcome brought Perez to the final performance management step, being reviewed for separation. On January

---

[5] Notably, Perez's failed October 2011 scorecard had already progressed her to the next step of final written warning under Verizon's performance management program. Any further failures would progress her to the final level of "employee reviewed for separation." Ponce's November 3, 2011 "Coaching Session Form" indicates that Perez was on "FWW-weekly review". (Perez deposition at Ex. 35). Perez appeared confused about this progression during her deposition.

10, 2012, Ponce and Ruth Delgado, another supervisor, held a coaching session with Perez. They informed Perez that she needed to improve and that if Perez could continue to improve, she could be removed from the performance plan.

On January 11, 2012, Ponce, after consulting with Stanford, sought approval to terminate Perez and submitted a termination request to Human Resources. The termination was based on Perez's December 2011 performance, i.e., failing the December 2011 scorecard. Ponce explained during her deposition that she coached Perez on January 10, 2012, and told Perez that continued improvement could prevent Perez from losing her job because, at that time, it was uncertain whether HR would approve of Ponce's impending recommendation to terminate Perez. Specifically, Ponce testified: "I don't know at this moment if the submission for termination will be approved or not. I still have to continue with the process, which is their review and their reports and their weekly stats." (Ponce deposition at 32:24 - 33:1-2).

On January 12, 2012, Perez e-mailed a Verizon supervisor named Hayden Wills, thanking him for hiring her and noting that her employment "might be sadly coming to an end because I have run out of opportunities for improving". (Perez deposition at Ex. 38). The next day, January 13, 2012, while Ponce's termination request remained pending, Perez faxed a healthcare provider certification to MetLife in a renewed attempt to secure FMLA

intermittent leave to care for her mother. It is undisputed that Ponce and Stanford were unaware of Perez's January 13, 2012 FMLA request.[6]

On January 17, 2012, Human Resources, also unaware of Perez's FMLA request, approved Perez's termination and communicated the decision to Stanford on January 18, 2012, the same day that MetLife coincidentally opened a new care-giver FMLA claim for Perez. On January 18, 2012, Perez used the newly authorized intermittent leave. The next day, January 19, 2012, Perez was terminated for performance in a meeting with Stanford, who continued to have no knowledge of the new FMLA claim. During the meeting, Stanford referred to Perez's failed December scorecard and told Perez that she was being fired based on her poor performance. Neither Stanford nor Wills, who was also in attendance, mentioned any of Perez's absences throughout her employment. This lawsuit subsequently ensued.

## **SUMMARY JUDGMENT STANDARD OF REVIEW**

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[6] Indeed, Stanford repeatedly testified during his deposition that he was unaware that Perez was on FMLA during her employment with Verizon. (Stanford deposition at 44:16-17; 45:23 - 46:1-5; 47:11-13; 48:15-18; 52:8-16; 57:1-5; 59:1-16). Ponce testified that she did not know whether Stanford received any information about Perez's FMLA leave. (Ponce deposition at 44:10-13). Similarly, Perez testified that the only conversation she had with Stanford about FMLA was when he recommended that she request it for her mother; there is no evidence suggesting that Perez ever told Stanford that she actually applied for and received FMLA for this purpose. (Perez deposition at 56:1-6; 132:5-20; 179:3-13).

322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson,* 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir. 1990). However, there must exist a

conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

The FMLA entitles an eligible employee to take twelve workweeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(D). In addition to taking twelve weeks of leave at once, an employee may take intermittent leave in separate blocks of time because of a single qualifying medical reason. 29 C.F.R. § 825.202(a). To preserve these rights to take leave, the FMLA creates two types of claims: interference claims, in which an employee alleges that his employer denied him a benefit guaranteed under the Act, 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act. 29 U.S.C. § 2615(a)(2).

Retaliation and interference claims have different standards of proof. To state an interference claim, a plaintiff must demonstrate that he was entitled to a benefit under the FMLA and the employer denied him the benefit. *See Strickland v. Water Works & Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206-07 (11th Cir. 2006). The employer's motives are irrelevant. *See id.* at 1208. In contrast, to succeed on a retaliation claim a plaintiff must show that the employer acted with discriminatory or retaliatory animus when the plaintiff was discharged. *See id.* at 1207.

**I.      Perez's Interference Claim**

Verizon moves for summary judgment on Perez's interference claim because the record is undisputed that Verizon made the decision to terminate Perez before Perez took FMLA approved intermittent leave on January 18, 2012.

The Court concludes that Verizon is entitled to summary judgment on this claim. The record is undisputed that Ponce recommended Perez's termination on January 11, 2012, after Perez failed her December 2011 scorecard, which placed her on the *final* step of the performance program, "employee reviewed for separation". (Suzi Pilsl declaration; Ponce deposition at 43:4-10). The record is also undisputed that Suzi Pilsl, the Manager of Human Resources, approved Ponce's termination request on January 17, 2012, also before Perez took leave under the new claim. Notably, Ponce, Pilsl, and Stanford were unaware that Perez sought FMLA for her mother during this time. Thus, Perez was not entitled to reinstatement after taking leave on January 18, 2012, because she would have been terminated for her performance *regardless of the leave*. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (finding no interference when employee's manager, who was unaware of employee's FMLA leave request, terminated the employee for performance reasons before commencement of the leave); *see also Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236 (11th Cir. 2010); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000). Accordingly, Verizon is entitled to summary judgment on this claim.

## II.     Perez's Retaliation Claim

Verizon argues that it is entitled to summary judgment on Perez's FMLA retaliation claim because, even assuming Perez can establish a *prima facie* case, Verizon had a legitimate business reason for Perez's termination, her poor performance, and Perez cannot establish pretext. The Court agrees.

In the absence of direct evidence of discrimination by the employer, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is applied in evaluating FMLA retaliation claims. To state a retaliation claim an employee must first establish a *prima facie* case of retaliatory discharge. An employee must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. *See Strickland,* 239 F.3d at 1207. Once an employee establishes a *prima facie* case, the burden of production shifts to the employer "to articulate a legitimate reason for the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1296, 1297 (11th Cir. 2006).

If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1298 (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000)). To show pretext, the employee may rely on evidence that he already

produced to establish his *prima facie* case. *See Martin v. Brevard County Pub. Schools,* 543 F.3d 1261, 1268 (11th Cir. 2008).

Here, the record is undisputed that Perez had performance problems during the relevant period of time. The record as outlined above is also undisputed that Verizon utilized and complied with its performance plan to determine Perez's discipline for performance-related issues: Perez moved forward a step when she received a failed scorecard, and she moved back a step when she achieved three consecutive months of adequate performance. The record is also undisputed that Perez's January 2012 termination was based on her December 2011 performance.[7] Accordingly, Verizon has established a legitimate reason for the adverse action.

Perez has not presented sufficient evidence establishing pretext. Perez's arguments regarding Verizon's failure to properly apply its performance management program are without merit. The Court detailed above each moment when Perez moved down or back a step based on the *record evidence*. Each time Perez achieved three consecutive months of adequate performance, she moved back a step. Any argument to the contrary is unsupported in the record.

Perez also attempts to poke holes in Verizon's nondiscriminatory reason by arguing that Ponce's credibility is questionable because she coached Perez on January 10, 2012, and implied that Perez would not lose her job if she maintained her January numbers. The

---

[7] Perez's arguments regarding her improved January 2012 performance are irrelevant because the decision to terminate her had already been made based on her December performance.

record, however, is undisputed that Ponce requested Perez's termination on January 11, 2012, before Perez requested intermittent leave under the FMLA. And Ponce explained that she continued to coach Perez, before and after this request, because Ponce did not know whether HR would approve her termination request. Moreover, Perez, herself, acknowledged the possibility of her termination based on her failed December scorecard, e-mailing Wills on January 12, 2012, that her employment "might be sadly coming to an end because I have run out of opportunities for improving". (Perez's deposition at Ex. 38).

Although Perez appears to hang her hat on the temporal proximity between the exercise of her FMLA rights and her discipline and ultimate termination, there is nothing in the record to support her speculation that these adverse actions were related in any way to Perez's FMLA-related activity. Indeed, there is no evidence whatsoever of retaliatory animus in this case, and nothing that remotely challenges Verizon's reason for Perez's termination. To the contrary, Perez's use of FMLA leave was a feature of her employment for almost a decade. She used leave during years in which she was rated highly, and she was promoted and received raises during this same time as well.

There is also nothing in the record to suggest that Verizon prevented Perez from meeting her performance goals. This distinguishes this case from the cases Perez relies upon, in which the employees were on performance plans when they took their leave under the FMLA and the employer did not allow them the opportunity to complete those plans before terminating them.

Finally, Perez's conclusory remarks about Verizon's more favorable treatment of other employees are too speculative to establish a genuine issue of material fact. Perez does not identify any other Financial Services Senior Representative *with her same or similar scorecard history* who was disciplined more leniently. Thus, these arguments also fail to establish pretext. Accordingly, Verizon is entitled to summary judgment on this claim.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Cellco Partnership d/b/a Verizon Wireless' Motion for Summary Judgment (Dkt. 39) is GRANTED.

2. The Clerk of Court is directed to enter final judgment in favor of Defendant and against Plaintiff.

3. The Clerk of Court is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on September 10, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2012\12-cv-546.msj.frm